IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| ROBERTA J. HESS *ex rel.* UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>v.<br><br>THE NEBRSKA MEDICAL CENTER a Nebraska nonprofit corporation,<br><br>    Defendant. | Case No. 17-340<br><br>**COMPLAINT**<br><br>*JURY TRIAL DEMANDED*<br><br>Location: Omaha, Nebraska |

Roberta J. Hess ("Ms. Hess") files this Complaint against Nebraska Medical Center, on behalf of herself and the United States of America, pursuant to the *qui tam* provisions of the False Claims Act, 31 U.S.C. §§ 3729-2732 (2012) ("FCA"), Title VII, 42 U.S.C. § 2000-2, *et seq.*, and ADEA 29 U.S.C. § 621, *et seq.*  In support of her Complaint, Ms. Hess alleges:

### INTRODUCTION

1.      This civil action arises from Nebraska Medical Center's ("NMC" or "the Hospital") submission of false statements, records, and claims in Medicare billings that were paid by the United States government.  NMC violated the Nebraska Fair Employment Practices Act ("FEPA") and the FCA by firing and discriminating against Robbie Hess, who discovered and brought to light falsified Medicare submissions by NMC.  *See* 31 USC §§ 3729 *et seq.*; and Nebraska FEPA, Neb. Rev. Stat. § 48-1114(3) (Reissue 2004).  Ms. Hess seeks recovery of treble damages and civil penalties under the FCA and general damages under the FEPA.

2.      The FCA violations arise out of NMC's knowing use of falsified records, statements, and certifications of compliance with Medicare statutes, regulations and Department of Health and Human Services policies.  NMC submitted false claims to Medicare by relying on bills that were never signed by the provider, including billings for services that were not rendered. NMC's practices are forbidden by the National Correct Coding ("NCCI") Policy Manual for

Medicare Services.[1]

3.      The Medicare and/or Medicaid claims submitted by NMC are fraudulent and false with respect to submissions by Dr. Haysam Akkad ("Dr. Akkad").  Dr. Akkad falsely certified, on behalf of NMC, that Medicare services were provided in compliance with regulations.  Each statement and certification submitted by NMC, which was required to be certified by Dr. Akkad was both false and fraudulent because the forms were not certified by Dr. Akkad, but by staff assistants, sonographers and others.

4.      In September 2015, Ms. Robbie Hess learned from staff assistant, Andrea Lambiasi ("Lambiasi"), that NMC cardiologist Dr. Akkad had given both Lambiasi and sonographer Keith Rogers his electronic password.  This allowed each of them to sign off on medical procedures and tests supposedly conducted by Dr. Akkad and his office to be submitted for bulling purposes to the Center for Medicare Services.

5.      The Center for Medicare and Medicaid Services "CMS" is a federal agency within the United States Department of Health and Human Services.  Medicare payments are submitted on CMS Form 1500.  The front page of Form 1500 states in Box 31: "I certify that the statements on the reverse apply to the bill and are made a part thereof."[2]



6. The back of CMS Form 1500, in text which is set apart and in bold typeface, further

---

[1] http://www.cms.gov/NationalCorrectCodInitEd/01_overview.asp#TopOfPage; 42 U.S.C. §§ 1395,

[2] The online form is printed in "red" typeface and is not easily readable when copied.

states:

> NOTICE: Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties.

CMS Form 1500 specifically requires certification by a physician or other supplier that the services on the form were personally performed.

> SIGNATURE OF PHYSICIAN OR SUPPLIER (MEDICARE, CHAMPUS, FECA AND BLACK LUNG)
> I certify that the services shown on this form were medically indicated and necessary for the health of the patient and were personally furnished by me or were furnished incident to my professional service by my employee under my immediate personal supervision, except as otherwise expressly permitted by Medicare or CHAMPUS regulations.

7.      When Ms. Hess learned of this illegal practice, she and another sonographer, Joan Olson ("Olson"), reported the matter to NMC Medical Director Tom Porter ("Porter").   Porter directed Ms. Hess and Olson to report the matter to Ms. Hess' manager, Melissa Christian ("Christian").  She did so.  Christian informed Ms. Hess the NMC Human Relations department would investigate the echocardiography department.   Ms. Hess was not told of the results of the investigation.

8.      Immediately after that investigation was initiated, Christian summoned Ms. Hess to her office at least weekly to confront her about trivial matters, unrelated to the investigation. This practice continued throughout the remainder of Ms. Hess' employment.  Ms. Hess had never been subjected to such frequent monitoring until after she reported Dr. Akkad's practice of allowing staff members to forge his electronic signature on submissions to the CMS for payment from Medicare and Medicaid.  The Medicare claims presented by NMC for payment by the United States government are false and illegal as a matter of law.

9.      The monitoring continued despite the fact NMC evaluated Ms. Hess' performance as "exceeding expectations" for the entire period she was at NMC, which started in October 1982.

10.      Ms. Hess brought the false submissions to NMC's attention.   NMC purportedly

investigated but Ms. Hess is only aware of one result: NMC fired Ms. Hess.  She was fired in retaliation for her conscientious actions in reporting and objecting to Medicare fraud being orchestrated by NMC cardiologist Dr. Haysam Akkad and sanctioned by NMC.

11.     NMC's actions violated both state and federal law in the manner set forth below.

| Claim I | **31 U.S.C. § 3729(a)(1)(B)** |
| | Knowing creation of false billing records for submission to the government |

| Claim II | **31 U.S.C. § 3729(a)(1)(A)** |
| | Knowing presentation of false billing records for payment to the government |

| Claim III | **31 U.S.C. § 3729(a)(1)(C)** |
| | Conspiring to commit a violation of 31 U.S.C. 3729(a)(1)(B) and U.S.C. 3729(a)(1)(A), |

| Claim IV | **31 U.S.C. 3730(h)(1). Neb. Rev. Stat. 21 1114** |
| | False Claims Act and FEPA retaliation, |

| Claim V | **Neb. Rev. Stat. §§48-1004, 1104; 42 U.S.C. §2000e-2; 29 U.S.C. § 623.** |
| | Age discrimination, sex discrimination and retaliation for engaging in protected activity and opposing NMC's unlawful business practices. |

| Claim VI | **Defamation** |
| | Injury to Ms. Hess' fitness to do her job. |

## JURISDICTION & VENUE

12.     This Complaint is based on the False Claims Act, 31 USC §§ 3729 *et seq.* and Title VII 42 U.S.C. §20003-2 *et seq.* and the ADEA, 29 U.S.C. § 623 *et seq.*  The Court has federal question jurisdiction of this matter pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732(a). There has been no public disclosure of allegations in a criminal, civil, or administrative hearing, or a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation or from the news media.  31 U.S.C. § 3730(3)(4)(A).

4

13.     This Court has supplemental jurisdiction of Ms. Hess's Nebraska state law claims pursuant to 28 U.S.C. § 1367.

14.     Venue is proper in this district pursuant to 28 U.S.C. §1391(a) and (b), and 31 USC §3732(a).  Defendant NMC does business at 987400 Nebraska Medical Center, Omaha, NE 68198-7400.  The acts proscribed by 31 USC §§3729 *et seq.* and the Nebraska FEP, §§48-1004 and 1114, were orchestrated from, planned in and carried out in this District.

## PARTIES

15.     Robbie J. Hess, is now a resident of Atlanta, Georgia.  At all times relevant to this Complaint, she was a resident of Omaha, Nebraska.  She is a registered nurse.  She was a staff nurse at the time she was terminated by NMC on March 3, 2016.  Ms. Hess dual-filed a charge of discrimination with the Nebraska Equal Opportunity Commission ("NEOC") and the Equal Opportunity Commission ("EEOC") and has obtained a Right to Sue letter.[3]

16.     NMC is now, and at all relevant times was, a Nebraska nonprofit domestic corporation.  NMC does business at 987400 Nebraska Medical Center, Omaha, NE 68198-7400. NMC receives funding from the United States federal government through Medicare and Medicaid reimbursement.

17.     NMC provides cardiology services in the greater Omaha, Nebraska area.  NMC provides inpatient care, surgery, clinics, and emergency services.  Dr. Akkad provides services and treats conditions including aortic conditions, aortic stenosis, heart attack, heart failure, heart imaging diagnostics, heart rehabilitation, heart valve care, heart and vascular, high blood pressure, minimally invasive surgery, mitral valve regurgitation, pulmonary hypertension and vascular care.[4]

---

[3] Exhibit A to this Complaint is a true and correct copy of Ms. Hess's Right to Sue Letter.
[4] https://www.nebraskamed.com/doctors/haysam-akkad

**BACKGROUND FACTS**

18.     Ms. Hess started working for NMC in October 1982.  She was born on November 18, 1957, making her 59 years old.  While she was employed at NMC, Ms. Hess was hardworking, dedicated, and well-respected.  She had many years more experience than her co-RNs, including twenty years of experience as an operating room ("OR") nurse.

19.     The medical providers for whom Ms. Hess worked gave her the highest praise.

> closely.  In my opinion, she was one of the best clinical nurses with whom I have had the pleasure of working in my three decades as a surgeon.  Her attention to detail was superior, her devotion to her patients exemplary, and her instincts and intelligence often proved life-saving.  As her career progressed, her interactions with new nurses revealed outstanding leadership and teaching skills, both of which she has cultivated to great advantage to the institution.

(Letter from Byers W. Shaw Jr., MD FACS 3/16/2016, a true and correct copy is attached as Exhibit B and incorporated here by this reference.)

20.     Despite years of outstanding work resulting in the highest praise and recommendations, Ms. Hess was targeted by a new supervisor, Melissa Christian.  Ms. Christian, a staff nurse in her 30's, was nearly 30 years younger than Ms. Hess.  Christian was critical of Ms. Hess' work from the beginning of her supervisory duties over Ms. Hess.

21.     One of Christian's first acts was to strip Ms. Hess of all departmental responsibilities and committee memberships.  Christian informed Ms. Hess she no longer was allowed to work at NMC's Oakview location.  Ms. Hess was shocked, as she was responsible for putting in place the nursing protocols for NMC's Oakview nuclear program.  When Ms. Hess asked Christian "why" she said she would have to find out.

22.     On another occasion, Christian told Ms. Hess, while she was in a patient room, that Dr. Akkad had stated he did not want Ms. Hess to care for his patient.  When Ms. Hess asked why, Christian said she would need to find out.  Christian returned hours later and reported to Ms. Hess she could, in fact, care for Dr. Akkad's patients.

6

23.     During the following three (3) weeks, Ms. Hess asked Christian for the rationale behind the ban at Oakview.  Ms. Hess' inquiries resulted in Christian giving Ms. Hess a corrective action.  According to Christian, Dr. Gangahar, Dr. Akkad, and a "mystery patient" complained about Ms. Hess.

24.     The only explanation of these complaints related to a notation by Ms. Hess on one of Dr. Gangaher's reports, which was in Ms. Hess' work queue.

    a. In February 2016, Ms. Hess was assigned a worksheet with medical information from Dr. Gangahar to be input to the NMC "Muse" system.  The worksheet is not part of a patient's medical record.  It is akin to scratch paper, that is used at a later time for entry into the electronic medical record.  The electronic Muse system associates a barcode with each official document that is entered into a patient's file.

    b. The specific document at issue in Ms. Hess' case is a treadmill stress test, which typically is supervised by a cardiology fellow.  A staff physician then reviews and signs the test.  The worksheet is given to the secretary (or staff assistant) who enters the information into the patient's electronic medical record.  The worksheet does not have a barcode; it is shredded after the input is completed.

    c. This particular worksheet had been given to the secretary without the name of the staff physician.  The secretary approached Ms. Hess and asked who the physician was for the test.

    d. Ms., Hess told her and quickly wrote the physician's name on the worksheet.  Ms. Hess immediately realized the physician needed to sign the worksheet, even though Ms. Hess had written the physician's name (in her own handwriting) on the worksheet.  Ms. Hess kept the worksheet, until she could get the physician's signature.  Ms. Hess did not give the worksheet back to the

7

secretary.

e.  Unbeknownst to Ms. Hess, Lambiasi snatched the worksheet from Ms. Hess'
desk and provided it to management, including Ms. Hess' supervisor.  When
Ms. Hess was in the manager's office a few days later, Christian confronted
her.   Christian accused Ms. Hess of forging Dr. Gangaher's signature.
Significantly, Christian showed Ms. Hess a worksheet that did not have a bar
code.  Unless a document has a barcode, it is not an official document that is
part of a patient's electronic medical records.

f.  Ms. Hess responded truthfully to Christian, explained the circumstances, and
stated she wanted to correct the error.  Christian refused.

g.  A few days later, Ms. Hess approached Christian again and told Cristian she
had the right to manually correct the "error."  Christian claimed not to know
where the worksheet was, and told Ms. Hess, "It's too late."

h.  Twenty minutes later, Christian contacted Ms. Hess, summoned her to the
manager's office, and terminated her.

**FALSE BILLING AND FORGED CERTIFICATIONS**

25.  Dr. Akkad overbilled for his cardiology services.

a.  First, Dr. Akkad did not have completed paperwork, paper or electronic,
evidencing stress test and other procedures he claimed to have performed.
Dr. Akkad submitted worksheets for cardiology services that were not
performed.

b.  When NMC's Omaha location requested records from Dr. Akkad's clinic in
Shenandoah, Iowa, no records could be found.  Requests for stress tests and
echocardiograms were nonexistent.  Yet, Dr. Akkad submitted bills, invoices,
and certifications for these stress tests and the echocardiograms, both pre pics
and post pics.  In fact, the test function itself was not in service.

8

26. Dr. Akkad falsely submitted his billing and invoices to CMS.

    a. Dr. Akkad has an electronic signature which is password protected.

    b. He provided his password to the stenographers at NMC. The stenographers entered the test results, including the measurements for the cardiac images. These same secretaries and stenographers signed the records with Dr. Akkad's password protected signature.

    c. The individuals who signed Dr. Akkad's name electronically include Andrea Lambiasi, staff assistant (or secretary); Keith Rogers, sonographer; Dave Copenhaver, sonographer; Nicole Matheson, nurse; and Rose, LNU.  Upon completion, these reports go to NMC billing and are forwarded to CMSD for payment and/or reimbursement.

27. When she learned of this information, Ms. Hess reported it to NMC's Medical Director, Dr. Tom Parker.  Dr. Parker's response was that Dr. Akkad needed to be arrested.  Dr. Parker advised Ms. Hess to report the information to her supervisor and while Ms. Hess was in his office called Michaela Newman.  They planned to report the practice to Human Resources.  The following Monday all involved were interviewed by HR.  Several of the sonographers and staff assistants admitted to signing off Dr. Akkad's reports, using his password.  Others denied having done so.

**CLAIM I**

**VIOLATION OF 31 U.S.C. § 3729(a)(1)(B)**
**(Knowing Creation of False Records**
**for Submission to the Government)**

28. Plaintiff restates paragraphs 1 through 27, as if fully set forth here.

29.  In 31 U.S.C. § 3729(a)(1)(B), the False Claims Act precludes the creation of false billing.

**(a)**    **Liability for Certain Acts. –**

    (1) **In general. * * * [**A]ny person who -- * * *

(B) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government; * * *

is liable to the United States Government for a civil penalty of not less than [$5,500] and not more than [$11,000], plus 3 times the amount of damages which the Government sustains because of the act of that person,

30.     Courts are generally in accord that the False Claims Act's statutory language imposes mandatory civil penalties.[5]  Imposition of forfeitures under the Act is not discretionary, but is mandatory for each claim found to be false."[6]

31.     According to the Section 3729(b), "knowing" is defined as follows:

* * *

(b) Knowing and Knowingly Defined. - For purposes of this section, the terms "knowing" and "knowingly" mean that a person, with respect to information –

(1) has actual knowledge of the information;
(2) acts in deliberate ignorance of the truth or falsity of the information; or
(3) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required.

32.     Dr. Akkad created false billing records by:

d.  stating in hospital records he provided certain services to patients that he did not provide, and

e.  allowing support staff to certify his invoices with respect to services provided and billed.

33.     Ms. Hess discovered what she identified as Medicare fraud connected with Dr. Akkad's records and brought it to the attention of her supervisor and NMC's highest level of medical management, Dr. Parker.  Armed with information of fraud at its facility, NMC's HR

---

[5]54 The Government Contractor, No. 17 at ¶ 137 *The FCA's Penalty Provision-Consistently Inconsistent,* (May 12, 2012 Thompson Reuters).
[6] *United States v. Killough,* 848 F.2d 1523, 1533 (11th Cir. 1988); *see also United States v. Peters,* 927 F. Supp. 363, 368-69 (D. Neb. 1996) (Kopf, J.)

Department interviewed its staff.

34.    NMC presented those claims, based on Dr. Akkad's false and fraudulent billings, to the Government for Medicare/Medicaid payment.  NMC, by and through its agents and/or employees, made false statements by reviewing and relying on Dr. Akkad's false and fraudulent billing records for NMC's own submission of claims for payment from Medicare.  In submitting Form 1500, NMC certified that Dr. Akkad performed the services billed, correctly billed the services, and properly calculated his service time and billing.  In truth, NMC was on notice of and refused to take any steps to correct Dr. Akkad's false and fraudulent billing practices.  In callous disregard of the federal crimes and conduct involved, NMC allowed the scheme to proceed.

35.    Because she was terminated, Ms. Hess does not have for access to the records of procedures in which Dr. Akkad claims to have participated.  Ms. Hess, however, was personaly advised by the staff in Dr. Akkad's practice that they did, in fact, sign his electronic signature to his billing records.  Further, Ms. Hess participated in the attempt to retrieve records from the Shenandoah, Iowa facility which proved to be completely fruitless.  No such records existed.

WHEREFORE NMC's false and fraudulent acts, described above, by which it knowingly created false and fraudulent records, has caused Plaintiff damages in an amount to be determined at trial.

**CLAIM II**

**VIOLATION OF 31 U.S.C. § 3729(a)(1)(A)**
**(Knowing Presentation of False Billing Records for Payment to the Government)**

36.    Plaintiff restates paragraphs 1 through 35, as if fully set forth here.

37.    In 31 U.S.C. § 3729(a)(1)(A), the False Claims Act precludes presenting or causing to be presented a false or fraudulent claim to defraud the Government under the False Claims Act.

**(a) Liability for Certain Acts. –**

   (1) ***In general.* --** * * * [A]ny person who –

      (A) knowingly presents, or causes to be presented, a false or
         fraudulent claim for payment or approval;  * * *

is liable to the United States Government for a civil penalty of not less
than $5,000 and not more than $10,000, * * * plus 3 times the amount
of damages which the Government sustains because of the act of that
person.

38.     Ms. Hess discovered what she identified, and Medical Director Dr. Parker

acknowledged, as illegal acts.  The relevant records submitted by Dr. Akkad for payment, which

were in turn relied on by NMC for its submission to Medicare, were false and not prepared

according to requirements by the CMS.  Ms. Hess brought the specifics of her discovery to her

supervisor's attention and to NMC's highest levels of medical management.   Despite this

knowledge, NMC has continued to create its billings based on Dr. Akkad's false and fraudulent

billing records, described above, which were presented to the Government for payment by

Medicare and/or Medicaid.

      WHEREFORE Defendants' false and fraudulent acts, described above, by which

NMC knowingly presented false and fraudulent records for payment, has caused Plaintiff

damages in an amount to be determined at trial.

**CLAIM III**

**VIOLATION OF 31 U.S.C. § 3729(a)(1)(C)**
**(Conspiring to Commit a Violation of 31 U.S.C. § 3729(a)(1)(A), (B))**

39.     Plaintiff restates paragraphs 1 through 38, as if fully set forth here.

40.     According to 31 U.S.C. §3729(a)(1),

   (a) **Liability for Certain Acts**. --

      (1)  * * * [A]ny person who * * *

12

(C) conspires to commit a violation of subparagraph (A), (B) * * *

is liable to the United States Government for a civil penalty of not less than [$5,500] and not more than [$11,000], plus 3 times the amount of damages which the Government sustains because of the act of that person[.]

41.     Civil conspiracy requires an agreement to participate in an unlawful activity and an overt act that causes injury.[7]

42.     NMC, through its agents and/or employees, agreed with Dr. Akkad to submit false Medicare billing records created at Dr. Akkad's behest.  In furtherance of the conspiracy, NMC employees and agents approved Dr. Akkad's records, tests, and billings for submission by NMC for payment by the Government.  NMC relied on and approved the false billing records for payment, and NMC relied on those records when it submitted its claims for payment from Medicare/Medicaid, knowing they were false and fraudulent.

    a.     No later than September 2015, Ms. Hess learned that Medicare fraud was being perpetuated by NMC through Dr. Akkad's records and billings.

    b.     NMC's Medical Director, Dr. Tom Peters and Ms. Hess' Supervisor Christian, were told by Ms. Hess of her concerns about Dr. Akkad's practices and Medicare/Medicaid fraud.  As far as Ms. Hess is aware, NMC continued to present Dr. Akkad's billings to the Government for payment by Medicare/Medicaid.

    c.     When Ms. Hess reported to Dr. Peters the issue of Dr. Akkad's Medicare/Medicaid billings, Joan Olson, another sonographer, accompanied Ms. Hess. Together, they explained what was occurring in Dr. Akkad's practice and how Dr. Akkad's

---

[7] *McCarthy v. Kleindienst*, 741 F.2d 1406, 1413 n. 7 (D.C.Cir.1984); *accord Mizokami Bros. v. Mobay Chem. Corp.*, 660 F.2d 712, 718 n. 8 (8th Cir.1981); *Rotermund v. United States Steel Corp.*, 474 F.2d 1139, 1145 (8th Cir.1973).

staff assistants and sonographers were in possession of his electronic password and signing his reports and billings for him.

43.     NMC, its agents, employees and staff, cooperated with Dr. Akkad in the submission of false and fraudulent Medicare/Medicaid billing.  Defendant NMC cooperated, knowing the foregoing acts constituted a violation of Section 3729(a)(1)(C) of the False Claims Act by conspiring to present or cause to be knowingly presented false/fraudulent billing records for payment and/or approval to the Government.

WHEREFORE Defendants' conspiracy to create submit billing records based on false and fraudulent acts, described above, in which NMC and Dr. Akkad knowingly agreed and participated.  Ms. Hess exposed the fraudulent practices, which caused her damages in an amount to be determined at trial.

## CLAIM IV
### VIOLATION OF 31 U.S.C. 3730(h)(1); Neb. Rev. Stats§ 48-1114(3)
### (Retaliation)

44.     Plaintiff restates paragraphs1 through 43, as if fully set forth here.

45.     Section 3730 of the False Claims Act provides as follows:

> Any employee who is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment by his or her employer because of lawful acts done by the employee on behalf of the employee or others in furtherance of an action under this section, including investigation for, initiation of, testimony for, or assistance in an action filed or to be filed under this section, shall be entitled to all relief necessary to make the employee whole. Such relief shall include reinstatement with the same seniority status such employee would have had but for the discrimination, 2 times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees. An employee may bring an action in the appropriate district court of the United States for the relief provided in this subsection.

31 U.S.C. § 3730(h)(1).  Additionally, Nebraska's FEP provides in Section 48-1114,

> It shall be an unlawful employment practice for an employer to discriminate against any of his or her employees or applicants for employment, for an employment agency to discriminate against any individual* * * because he or she * * * (3) has opposed any practice or refused to carry out any action unlawful under federal law or the laws of this state.

Neb. Rev. Stat. § 48-1114(3).

46.     As already explained, Ms. Hess informed NMC management of her concern that NMC was committing Medicare/Medicaid fraud through Dr. Akkad's billing practices.  NMC was approving and relying on Dr. Akkad's false and fraudulent billings.

47.     Right after Ms. Hess reported the fraudulent practices, Christian subjected Ms. Hess to hyper-monitoring, ordered that Ms. Hess report to Christian's office for trivial reasons, which included:

>    a.   Receiving a written warning for stating she felt like she was the only nurse at work and that she would continue working "like I always do."
>
>    b.   Being questioned about whether she ate breakfast after she came to work.
>
>    c.   Being reported for supposedly not liking to give "contrast."
>
>    d.   Being questioned about going out to get coffee when a sonographer needed contrast during a procedure.
>
>    e.   Being told she was not doing the morning schedule as well as another nurse.

48.     Ms. Hess was threatened, harassed, and discriminated against in the terms and conditions of her employment and then fired because of lawful acts done by her in efforts to stop NMC's violations of Medicare and other federal statutes.  *See* False Claims Act, 31 U.S.C. §§ 3729-3733; Neb Rev. Stat, § 48-1114(3).  The foregoing acts by NMC constituted a violation of Section 3730(h) of the False Claims Act through the discharge of Ms. Hess because her actions, in furtherance and investigation of this action, were protected under 31 U.S.C. 3730(h) and

constituted opposition to practices made illegal under federal law.

WHEREFORE NMC's retaliation against Ms. Hess has caused her damages in an amount to be determined at trial.

### CLAIM V
### <u>VIOLATION OF TITLE VII AND NEBRASKA FEPA</u>
**(Age and Sex Discrimination)**

49.   Plaintiff restates paragraphs 1 through 48, as if fully set forth here.

50.   Title VII and the Nebraska Fair Employment Practices Act provide parallel prohibitions on sex discrimination.

a.   NMC violated the state and federal prohibitions on sex discrimination. According to applicable statutes:

It shall be an unlawful employment practice for an employer—
(1)   to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's * * * sex[.]

42 U.S.C. § 2002e-2. Neb. Rev. Stat. § 1104.

b.   The foregoing state and federal statues protect Ms. Hess: (1) she is female; (2) she was more than qualified to her job, (3) NMC terminated her, and (4) she was not treated the same as other similarly situated females, and she was replaced by a significantly younger male employee who was not as qualified.

i.   NMC did not terminate the male sonographers who utilized Dr. Akkad's password protected signature to sign off on his records and results.

ii.   Ms. Hess was replaced by a younger male, Ryan LNU who had many years less experience than did she.

16

    c.  NMC had no legitimate non-discriminatory reason warranting Ms. Hess'

discharge.

        i.  Ms. Hess had reviews that showed she consistently met and

exceeded expectations.

        ii.  Ms. Hess was cleared of any wrongdoing regarding the

claimed forgery of a physician's signature when the

investigation showed the documents was not officially a part of

the NMC records.

    d.  The only reasons offered constitute pretext and demonstrate how differently

Ms. Hess was treated from others in Dr. Akkad's office.

51.  NMC violated the state and federal prohibitions on age discrimination.  According

to applicable statutes:

> (1) It shall be an unlawful employment practice for an employer:
>
> (a) To refuse to hire, to discharge, or otherwise to discriminate against any individual with respect to the employee's terms, conditions, or privileges of employment, otherwise lawful, because of such individual's age, when the reasonable demands of the position do not require such an age distinction[.]

Neb. Rev. Stat. § 488-1004(1); *see also* 29 U.S.C. § 623.

    a.  Both Nebraska's Fair Employment Practices Act and the ADEA protect Ms.

Hess: (1) She is over 40 years old in the protected age group; (2) She was

qualified for and performing the essential functions of her job; (3) She was

terminated; and (4) She was replaced by a significantly younger male who had

less experience than she.

        i.  Ms. Hess is 59 years old.  She has performed her job at levels

exceeding expectations for more than 30 years.

        ii.  Ms. Hess was supervised by younger individuals, including

Christian, and worked with several other younger staff

17

members, including Lambiasi, Nicole Matheson, and Michaela Newman.

iii. Ms. Hess was treated differently than younger employees. Departmental meetings were scheduled for Thursday, Ms. Hess' day off.  Newman excluded Ms. Hess from meetings by holding meetings while Ms. Hess was tending to patients. Newman publicly stated to other nurses in the department that she refused to talk to Ms. Hess unless another witness was present.  While Ms. Hess was tending to a patient, Newman informed Ms. Hess that Dr. Akkad did not want her tending his patients.  Shortly thereafter, Newman recanted and said it was okay for Ms. Hess to continue caring for Dr. Akkad's patients. When Newman was manager, the department voted for members of a United Based Council.  Two weeks passed when Ms. Hess learned she received the most votes from her peers and was to be president of the committee.  Newman however, went to the Nurse Practice Committee to get permission to remove Ms. Hess, Newman stated she did not want Ms. Hess on the committee because she did not trust her.  Newman refused to explain why.

iv. Christian also treated Ms. Hess different than other nurses in the department.  When Christian started, she stripped Ms. Hess of all responsibilities, committee memberships and the opportunity to work at Oakview.  Ms. Hess received a corrective action for stating she "feels like the only nurse here" and that she "would just do it like I always do."   Liz Wright, a

sonographer, announced to a full workroom that "[another nurse] doesn't know her head from her asshole." Wright publicly referred to Dr. Akkad as "that bastard." She also stated repeatedly, out loud, "I need a new fucking job." Ms. Wright was never given a warning or a corrective action for her comments.

b. NMC had no reason whatsoever to validate its discriminatory treatment of Ms. Hess, let alone a legitimate non-discriminatory reason.

c. The only rationale for Ms. Hess's termination was based on age and jealousy of a few younger nurses who were not paid as much.

WHEREFORE NMC's discrimination against Ms. Hess has caused her damages in an amount to be determined at trial.

## CLAIM VI

### (Defamation)

52. Ms. Hess restates paragraphs 1 through 51, as if fully set forth here.

53. A claim of defamation requires:

(1) A false and defamatory statement concerning the plaintiff;

(2) An unprivileged publication to a third party;

(3) Fault amounting to at least negligence on the part of the publisher; and

(4) Either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication.

*Nolan v. Campbell*, 13 Neb. App. 212, 218, 690 N.W.2d 638, 647 (2004).

54. Defamation is slanderous per se if the speaker "falsely impute[s] *** unfitness to perform the duties of an office or employment, or if they prejudice one in his or her profession or

trade ***."  *Matheson v. Del Stork*, 239 Neb. 547, 553, 477 N.W.2d 156, 160 (1991).

55.     In this case, NMC defamed Ms. Hess by stating that her termination was due to her unfitness to do her job.  NMC's statements forced Ms. Hess to self-report to the Nursing Board NMC's claim that she forged a physician's signature.  Ms. Hess attempted to challenge NMC's accusations in several internal appeals at NMC, to no avail.  When Ms. Hess and her family moved to Georgia, she applied for her nursing license there.  She was required to provide additional documentation explaining the situation and her ability to practice nursing was delayed for several months until Georgia conducted its investigation and ultimately cleared Ms. Hess of any wrongdoing.

## REQUEST FOR RELIEF

**WHEREFORE**, Ms. Hess respectfully requests that this Court assume jurisdiction as to all counts and grant all such relief as this Court deems equitable and just, as well as the following relief:

A.      Provide Ms. Hess with a trial by jury on all her claims;

B.      Declare the conduct of Defendants to be a violation of Ms. Hess federal rights set forth in this Complaint;

C.      Under Claim I for treble damages and for civil penalties up to $11,000 for each false or fraudulent claim knowingly made, used or caused to be made or used to get a false or fraudulent claim allowed or paid;

D.      Under Claim II for treble damages and for civil penalties up to $11,000 for each false or fraudulent claim submitted or caused to be submitted by Defendants;

E.      Under Claim III for treble damages and for civil penalties up to $11,000 for each false or fraudulent claim and for each materially false record, statement or

representation knowingly made, used, or caused to be made or used during the course of Defendant's conspiracy to defraud the United States.

F.       Under Claim IV, award all relief to Ms. Hess as allowed and as appropriate pursuant to applicable Federal law to make the Ms. Hess whole; including reinstatement with the same seniority status that Ms. Hess had at the time of termination; double back pay; interest on the back pay awarded, for special damages, litigation costs and reasonable attorney's fees pursuant to 31 U.S.C. § 3730 (h)(2); and for such other and further relief as this Court deems equitable and just

G.       Under Claim V, award temporary or permanent injunctive relief, general and special damages, reasonable attorney's fees and costs pursuant to Neb. Rev. Stat. §48-1119(3).

                                    RESPECTFULLY SUBMITTED,
                                    Roberta J. Hess,

                    By:        /s/Terry A. White_____
                                    Terry A. White, #18282
                                    Alexis S. Mullaney #25908
                                    CARLSON & BURNETT LLP
                                    17525 Arbor Street
                                    Omaha, NE 68330
                                    Direct (402) 682-8006
                                    Terry@Carlsonburnett.coM
                                    Alexis@Carlsonburnett.com
                                    *Attorneys for Plaintiff Roberta Hess*

.

EEOC Form 161-B (11/16)

U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## NOTICE OF RIGHT TO SUE (ISSUED ON REQUEST)

| To: | Roberta J. Hess<br>507 S 85th St<br>Omaha, NE 68114 | From: | St. Louis District Office<br>1222 Spruce Street<br>Room 8.100<br>Saint Louis, MO 63103 | EXHIBIT A |

|  | On behalf of person(s) aggrieved whose identity is CONFIDENTIAL (29 CFR §1601.7(a)) |

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 32E-2017-00083 | Joseph J. Wilson,<br>State & Local Program Manager | (314) 539-7816 |

(See also the additional information enclosed with this form.)

NOTICE TO THE PERSON AGGRIEVED:

Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act (ADA), or the Genetic Information Nondiscrimination Act (GINA): This is your Notice of Right to Sue, issued under Title VII, the ADA or GINA based on the above-numbered charge. It has been issued at your request. Your lawsuit under Title VII, the ADA or GINA must be filed in a federal or state court WITHIN 90 DAYS of your receipt of this notice; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

[X] More than 180 days have passed since the filing of this charge.

[ ] Less than 180 days have passed since the filing of this charge, but I have determined that it is unlikely that the EEOC will be able to complete its administrative processing within 180 days from the filing of this charge.

[X] The EEOC is terminating its processing of this charge.

[ ] The EEOC will continue to process this charge.

Age Discrimination in Employment Act (ADEA): You may sue under the ADEA at any time from 60 days after the charge was filed until 90 days after you receive notice that we have completed action on the charge. In this regard, the paragraph marked below applies to your case:

[X] The EEOC is closing your case. Therefore, your lawsuit under the ADEA must be filed in federal or state court WITHIN 90 DAYS of your receipt of this Notice. Otherwise, your right to sue based on the above-numbered charge will be lost.

[ ] The EEOC is continuing its handling of your ADEA case. However, if 60 days have passed since the filing of the charge, you may file suit in federal or state court under the ADEA at this time.

Equal Pay Act (EPA): You already have the right to sue under the EPA (filing an EEOC charge is not required.) EPA suits must be brought in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that backpay due for any violations that occurred more than 2 years (3 years) before you file suit may not be collectible.

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission

September 14, 2017

James R. Neely, Jr.,
Director

(Date Mailed)

Enclosures(s)

cc:    THE NEBRASKA MEDICAL CENTER
       c/o Jessica Kallstrom-Schreckeng
       JACKSON LEWIS
       10050 Regency Cir, Ste 400
       Omaha, NE 68114

       Alexis Mullaney
       CARLSON & BURNETT
       17525 Arbor St
       Omaha, NE 68130



UNIVERSITY OF
Nebraska
Medical Center

COLLEGE OF MEDICINE
Department of Surgery

March 16, 2016

EXHIBIT B

To Whom It May Concern:

I am writing to support the application of Roberta Hess. I have known her for more than 25 years, beginning when I led the solid organ transplant program at the University of Nebraska Medical Center and she was a nurse in the ICU. She was often involved in the care of our patients and during that time, I was able to observe her performance closely. In my opinion, she was one of the best clinical nurses with whom I have had the pleasure of working in my three decades as a surgeon. Her attention to detail was superior, her devotion to her patients exemplary, and her instincts and intelligence often proved life-saving. As her career progressed, her interactions with new nurses revealed outstanding leadership and teaching skills, both of which she has cultivated to great advantage to the institution.

Beyond her professionalism and expertise, Roberta is also a genuinely warm and friendly person. I found her calm yet effective during crises, full of good humor when appropriate and just plain likable all of the time.

I recommend her for your consideration with my highest enthusiasm and with no reservations.

Sincerely,

Byers W Shaw Jr, MD, FACS

983280 Nebraska Medical Center / Omaha, NE 68198-3280
402.559.5565 / bshaw@unmc.edu